HALE *v*. MATTESON.

Opinion delivered March 3, 1913.

1. CONTRACTS—MUTUAL ASSENT.—In order to constitute a binding contract of sale, there must be the mutual assent of both parties, to

the essential terms of the agreement. The intention of the parties is the first consideration. (Page 230.)

2.  CONTRACTS—SALE OF CHATTELS—QUESTION FOR JURY.—When parties enter into an agreement to sell and buy a grocery store, and all the terms of the sale except the amount to be paid for the stock, are agreed upon, and the goods were actually delivered to the buyer, there is sufficient evidence to show a binding contract of sale, and the question should have been submitted to the jury. (Page 231.)

3.  SALE OF CHATTELS—DELIVERY—PARTIAL PAYMENT.—A sale of chattels may be made by delivery and a partial payment only, even though the parties contemplated that there should be a further written contract, evidencing the sale upon the completion of an inventory. (Page 231.)

Appeal from Garland Circuit Court; *George W. Hays,* Judge; reversed.

STATEMENT BY THE COURT.

Appellants brought suit for damages for the breach of an alleged contract of sale of a stock of goods. They were the owners of a grocery store in the city of Hot Springs, known as the "Elite Grocery," together with the wagon and team and other property used in connection with said store, and on April 8, 1911, claimed to have sold and delivered through their agent, Hale, the grocery store, consisting of the stock of goods and merchandise, the wagon and team of mules and harness, and the good will of the business to the defendants; L. F. Matteson and Willie Johnson; the goods being sold at invoice price as shown by the inventory, which was taken immediately after the contract of sale was entered into; the mules, wagon and harness being sold for the sum of $335. The manner and time of the payment was also alleged and that the stock of goods, wagon, team and harness were delivered to the defendants on April 8, 1911, memorandum of the sale being executed in writing at the time, a copy of which was exhibited with the complaint. It was further alleged that the defendants took charge of the business and carried same on for the period of eight days, buying new groceries and selling the old stock and receiving pay

therefor and thereafter abandoned same, and that the defendants had wholly failed to pay the purchase price of the property. That plaintiffs carried out all the terms of their agreement with the defendants, and had been damaged in the sum of $750, for which they prayed judgment.

Willie Johnson denied the allegations of the complaint and alleged that he was not a party to the alleged contract. L. F. Matteson filed a separate answer, denying each allegation of the complaint, admitted that she had negotiated for the purchase of the grocery store, as alleged, but denied that the agreement was ever consummated and that she was put in possession of the stock of goods or the store. She alleged that there was an understanding and she did enter into an agreement to purchase the stock of goods, but that the details of the agreement were never settled and the purchase was not made; that the inventory of the goods was not taken as it was agreed to be taken and denied the authority of the agent to sell the goods. She alleged that she was damaged by the failure of the plaintiffs to carry out the contract in the sum of $500, for which she prayed judgment.

H. L. Hale testified that he acted as the agent for the owners of the Elite Grocery Store; that Mrs. Matteson came to the store and said she desired to buy a grocery store and he talked with her about the sale of the Elite Grocery; that she looked over the stock and they went somewhat into detail about it; in the next day or two they came back and made another examination of the stock and talked further the terms of sale. She said she would have $1,000 or $1,200 to put in it, cash, and he instructed her to get the money and put it into the bank, as there would be some expense, time and trouble attached to the taking of the inventory and he did not care to do this unless she was in a position to buy. She afterwards returned and said she had the money in the bank and was ready to make the first payment and asked

how much it would be. He said $100, and the following temporary agreement was then executed:

ARTICLES OF AGREEMENT.

Between Mrs. L. F. Matteson and Elite Grocery Company, by H. L. Hale, Mrs. Matteson and Willie Johnson agrees to buy the stock of groceries of the Elite Company, and wagon and team and pay $100 cash at completion of invoice and $125 the 15th day of February; $125 the 15th day of March, and $125 the 15th day of April, 1911. Balance due on stock, wagon and team to be paid $100 per month, fixtures to be used without cost till January, 1911.

H. L. Hale, for Elite Company.
L. F. Matteson.

H. L. Hale for the Elite Grocery Company, agrees on his part to deliver to Mrs. Matteson the Elite Grocery stock, consisting of about one thousand eight hundred ($1,800) dollars worth of groceries and team of mules, wagon and harness and the good will of the business, at the completion of the inventory and acknowledges the receipt of $100 as part payment thereon.

The Elite Grocery Co.,
By H. L. Hale.

That she gave her check for the $700 in payment. That the inventory was completed the first night, except some heavy goods and case goods that had not been opened and that when they finished everything was satisfactory and that he turned over the key to the store to her and went away. That he came back the next day and assisted in the store and introduced them to customers; that he did this for two days; introduced them to the wholesale men and that they told the customers and wholesale men that they had bought the store and that the name of the new firm was Matteson & Johnson, and that he did the same thing and instructed the old customers to that effect. That the temporary agreement was drawn up because it was not convenient to have everything agreed upon and the papers finally drawn

until the inventory had been taken. That she was in a hurry to take possession and that her daughter wrote one of the books when the inventory was made, while Johnson helped to take the goods and called them out during the making of it.

After the inventory was completed and the agreement drawn up, Mrs. Matteson refused to sign it, and finally abandoned the store without notice, leaving it in charge of the porter, who advised him that they had gone away. The first inventory, the one under which she purchased, showed $1,851, including the wagon and team, the stock of goods amounted to $1,516.81, the price of the wagon and team being $335.

Mrs. Matteson admitted making negotiations for the purchase of the store, that she signed the written agreement and had been in the store two or three days, telling some of the customers that she had purchased same and that she had purchased a few new goods; goods; that she became dissatisfied about the matter and when the final contract was presented to her, refused to sign it, claiming to be dissatisfied with the terms and that she did not care to buy certain fixtures. In her testimony she stated that the terms of the contract of sale, as finally written were not as agreed on, and she would not sign it at all. She denied that she ever was in possession of the store or that same had ever been delivered to her, although she admitted having told some of the customers that she had purchased the store and having bought certain bills of goods during her stay there for the new firm. She also claimed that the book in which the list of the goods had been taken down had been in the possession of Hale since the list was first made and that she would not take the stock on that account. She made other objections about the rent.

Willie Johnson testified that they were in the store from the 8th until and including the 14th, and they sold credit sales amounting to $98.36 during that time and that Hale was there every day during that time. They did not have their hands on the invoice books and that

his mother, Mrs. Matteson, refused to sign that contract after it was drawn up and after the inventory was taken, claiming that it was not in accordance with the first agreement made. She also claimed that the price of the goods in the inventory were to be figured by the wholesale merchants, while Hale claimed that it was only in the event of a dispute about the price that they were to be so figured. It was not disputed that her daughter made one list of the inventory as the goods were taken down and called off, and Mr. Hale stated that list was kept in the safe by appellees; that he had nothing whatever to do with it; that it was their copy. He said further that when Mrs. Matteson objected to the terms of the contract as finally drawn up, being too rigid, that he agreed to make any changes in it which she thought would rectify it in accordance with the agreement first entered into, and she declined to sign it at all and claimed she did not want the stock and was not going to have it.

There was a good deal of other testimony introduced and when it was all in the court instructed a verdict for the defendants and from the judgment thereon this appeal is prosecuted.

*J. B. Wood,* for appellants.

1. There was evidence to establish a valid sale. 63 Ark. 94; 77 *Id.* 556; 71 *Id.* 305; 73 *Id.* 561; 71 *Id.* 445; 76 *Id.* 520; 97 *Id.* 438. The question should have been submitted to a jury. 37 Ark. 483; 62 *Id.* 592; 116 N. Y. 371; 186 Mass. 495.

2. There was a completed sale; part of the purchase money paid and delivery of the goods. Cases *Supra*; 27 Pac. 713; 35 Cyc. 520; 4 Am. Dec. 374; 63 Am. St. 692; 33 Mo. 391; 84 Am. Dec. 52; 41 Miss. 164; 13 S. E. 660; 134 N. W. 174.

*S. W. Leslie,* for appellee.

1. The sale was never completed. 5 Ark. 161; 25 *Id.* 545; 19 *Id.* 566.

2. There was no delivery of possession.

3. The court properly directed a verdict for de-

fendants, as there was no evidence to establish plaintiff's claim. 71 Ark. 447; *Ib.* 305.

KIRBY, J., (after stating the facts). In order to constitute a binding contract of sale there must be a mutual assent of both parties to the essential terms of the agreement. Mere negotiations between them as to the subject matter or the terms of the sale will not be sufficient to make a binding contract and in determining whether such a contract has been made the first consideration is the intention of the parties.

As said in *Summit Lumber Company* v. *Shepherd,* 102 Ark. 88, 143 S. W. (Ark.) 102, "If it appears from the contract or the plain intention of the parties that there remains something to be done relative to the property as between the vendor and the vendee—as, for example, to ascertain the amount, quantity or price thereof before the title thereto shall pass—then the sale would not be complete and binding. In such event, the title to the property would not pass, and therefore no corresponding obligation to pay therefor would be assumed. On the other hand, if from the contract it clearly appears that it was the intention of the parties that the title to the property was actually passed and the ownership thereof transferred by the seller to the purchaser, then the contract of sale will be mutually binding and effective, although there remains something to be done in order to determine the total quantity of the property sold, or the total price thereof (citing cases). Where the property sold is identified, and a method is agreed upon for determining its price, then the mere fact that the total amount of such price is not definitely fixed in the contract, will not render the sale incomplete or ineffective."

In *Emerson* v. *Stephens Gro. Co.,* 95 Ark. 426; 130 S. W. 543, the court said: "If the contract is actually entered into and made, whether by messages, correspondence, or word of mouth, the agreement becomes at once effective, although it was expected that the terms would afterwards be embodied in a written instrument and signed. The mere reference to a future contract in

writing would not negative a present contract if the terms thereof were actually assented to by both parties. The written draft of the contract would only be a convenient record of the agreement and the evidence thereof, but it would only constitute evidence of the agreement, and its absence would not affect the binding force of the contract that was closed. Therefore, if an unconditional offer is made, and that offer accepted, this will constitute an obligatory contract, although the parties also understand that a written contract embodying the terms be drawn and executed." *Friedman v. Schleuter,* 105 Ark. 580, 151 S. W. (Ark.) 697; *Cage v. Black,* 97 Ark. 613.

If appellant's testimony, that the terms of the sale had been agreed upon, except the amount that was to be paid for the stock of goods, which was to be determined by the inventory to be taken as agreed and that the goods were actually delivered to appellees, be true, as the written agreement entered into at the time tends strongly to prove, and their other testimony as to the conduct of the parties relative to the delivery of the goods be taken as true, it would doubtless prove the sale, as alleged. A sale of the goods could have been made without any writing whatever, if accompanied by delivery and a partial payment therefor, and even though the parties contemplated that there should be a further written contract, evidencing the sale upon completion of the inventory it would not have prevented the contract of sale already made being effective, if it was in fact made. *Friedman v. Schleuter, supra.*

In any event there was material testimony, tending to show there was a valid contract of sale made by appellant, as alleged, and the question should have been submitted to a jury under proper instructions and the court erred in directing a verdict. *Williams v. St. Louis & S. F. Rd. Co.,* 103 Ark. 401, 147 S. W. (Ark.) 93, and cases cited; *Hutchinson v. Gorman,* 71 Ark. 305; *St. Louis, I. M. & S. Ry. Co. v. Coleman,* 97 Ark. 438.

The judgment is reversed and the cause remanded for a new trial.